UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNITED NATURAL FOODS, INC,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>INTERNATIONAL BROTHERHOOD OF<br>TEAMSTERS LOCAL 117, *et al.*,<br><br>　　　　Defendants. | CASE NO. C19-1736-LK<br><br>ORDER REGARDING CROSS<br>MOTIONS FOR SUMMARY<br>JUDGMENT |

This matter comes before the Court on the cross motions for summary judgment filed by Plaintiff United Natural Foods, Incorporated ("UNFI") and by Defendants and counterclaimants International Brotherhood of Teamsters Local 117 and Local 313 (collectively, the "Unions"). Dkt. Nos. 70, 71. UNFI and the Unions were parties to collective bargaining agreements that contained provisions regarding transferred employees' rights in the event an existing UNFI facility was moved. After UNFI announced a plan to consolidate two of its facilities to a new distribution center, the parties disputed the meaning of those provisions, culminating in arbitration. UNFI seeks to vacate the arbitration award, and the Unions seek to confirm it and hold UNFI liable for breach

of the parties' collective bargaining agreements. For the reasons set forth below, the Court denies

UNFI's motion for summary judgment and grants in part and denies in part the Unions' motion

for summary judgment.

## I.     BACKGROUND

### A.     Changes at UNFI spawn conflict

In October 2018, UNFI, a national wholesale grocery distribution company, acquired

SuperValu, Inc. and thereby became party to collective bargaining agreements with the Unions,

which represented employees in UNFI's facility in Tacoma, Washington. Dkt. No. 1 at 2, 4. Those

employees comprised four bargaining units of warehouse workers, inventory control workers,

warehouse clerks, and drivers. *Id.* at 2. The relevant collective bargaining agreements ("CBAs")

at issue in this case covered the Tacoma employees in those bargaining units effective July 15,

2018 to July 17, 2021. *Id.* at 3–4; Dkt. Nos. 1-2, 1-3, 1-4. As relevant here, Section 1.01.2 of the

CBAs[1] provides as follows:

> Movement of Existing Facility: In the event that [UNFI] moves an existing facility
> to any location within the jurisdiction of Joint Council of Teamsters No. 28 . . . the
> terms of this contract shall continue to apply with respect to the new facility. In
> addition, all employees working under the terms of this Agreement at the old
> facility shall be afforded the opportunity to work at the new facility under the same
> terms and conditions and without any loss of seniority or other contractual right or
> benefits. The designated Union will be required to show a majority representation
> in accordance with controlling law. In addition, the parties agree to enter into effects
> bargaining in accordance with controlling law regarding the impact on employees
> of the movement of an existing facility.

Dkt. No. 1-2 at 6 (the "Movement Provision").

In February 2019, UNFI announced that it would consolidate its Tacoma, Washington, and

Portland, Oregon, facilities into a newly constructed distribution center in Centralia, Washington.

---

[1] The CBAs include mostly identical language with minor variations that are inconsequential with respect to this litigation.

Dkt. No. 1-1 at 5. UNFI planned to close the Tacoma and Portland facilities[2] with the opening of the Centralia facility. Dkt. No. 1 at 4. The Centralia facility was anticipated to employ approximately 500 workers, and UNFI "encouraged" employees from the Tacoma facility to apply for those jobs. *Id.* at 5.

In March 2019, the Unions filed grievances against UNFI, claiming that it violated the CBAs by disclaiming the applicability of the Movement Provision to relocation of Tacoma employees to the Centralia facility. *See* Dkt. No. 72-1 at 433. UNFI denied the grievances, and the parties agreed to arbitrate the dispute. Dkt. No. 1 at 6.

**B.   The arbitrator finds in favor of the Unions**

A two–day arbitration was held on August 6 and 7, 2019. Dkt. No. 1 at 7. The issues before the arbitrator were (1) whether the dispute was arbitrable, (2) if so, whether UNFI violated the Movement Provision, and (3) if so, what the appropriate remedy should be. Dkt. 1-1 at 4. Under the CBAs, the arbitrator's powers were limited to "interpretations of and a decision concerning appropriate application of the terms of [the CBAs]"; the arbitrator had "no power to add to or subtract from or to disregard, modify or otherwise alter any terms of this or any other agreement(s) between the Union and Employer or to negotiate new agreements." Dkt. No. 1-2 at 23.

The arbitrator issued his Opinion and Award (the "Award") on October 7, 2019. Dkt. No. 1-1. The arbitrator found that arbitrability was "so intertwined" with the merits of the case that they should be discussed together "in order to provide a clear explanation for [the] final ruling." *Id.* at 9. The parties' substantive dispute centered on the Movement Provision. The Unions argued that the Provision entitled employees working at the Tacoma facility to work at the new Centralia facility under the same terms of employment they had in Tacoma. Dkt. No. 1-1 at 13. Although

---

[2]  The employees at the Portland facility are represented by unions that are not parties in this matter. Dkt. No. 1 at 5.

1   the Unions acknowledged that they could not represent the Centralia employees until a majority

2   of employees there supported such representation, they maintained that they merely sought to

3   enforce the Tacoma CBAs, and such enforcement did not constitute representation of the Centralia

4   employees. *Id.* at 10. In response, UNFI argued that employees were only entitled to employment

5   at the Centralia facility under the same terms if the Unions first demonstrated majority

6   representation. *Id.* at 11, 17. Because the Unions had not done this, UNFI argued that the dispute

7   was "a representation case subject to NLRB jurisdiction disguised as a grievance." *Id.* at 11.

8          In examining the meaning of the Movement Provision, the arbitrator identified several

9   "difficult[ies]" presented by the text. *Id.* at 12–13. First, there was an apparent conflict between

10  the first two sentences and the third: although the first two sentences "appear to grant clear rights

11  to existing employees that 'shall' apply," the third sentence (the "majority support" sentence)

12  "seems to add a condition that negates or limits the rights and benefits provided by the first two

13  sentences." *Id.* at 12. Examining the apparent conflict, the arbitrator found it unclear why the first

14  two sentences stated that the rights and benefits therein "shall" apply if those rights and benefits

15  were "conditioned on showing majority support[.]" *Id.* at 13. And, if the third sentence were a pre-

16  condition for the first two sentences, it was unclear why the first two sentences were included at

17  all, or in the very least why they were not placed after the majority support sentence. *Id.* at 12–13.

18  Observing that "the order of the sentences in [the Movement Provision] and the language used do

19  not give a completely clear picture of what the Parties intended," the arbitrator resolved to interpret

20  the language in a manner that best reflected the parties' intent. *Id.* at 13–14.

21         The arbitrator then considered testimony from the parties about their intent in negotiating

22  the Movement Provision. *Id.* at 14–16. Two witnesses for the Unions testified that the Unions'

23  objectives in negotiating that section were to enable union workers "to follow the work to a new

24  location," and to ensure that "in the transitional phase" to a new facility "the terms of the agreement

ORDER REGARDING CROSS MOTIONS FOR SUMMARY JUDGMENT - 4

[would] apply." *Id.* at 14–15. UNFI's witness testified that "the Union proposed the first two sentences of [the Movement Provision] and the Employer proposed the third sentence because the Employer did not want to agree 'to do what is more than we can legally do under board law'"; in other words, "the third sentence 'has to happen before the first two come into play.'" *Id.* at 15. On cross-examination, UNFI's witness "agreed that [UNFI] can set the terms and conditions, assuming no collective bargaining relationship exists, and nothing prevents [UNFI] from agreeing to allow the employees from Tacoma to transfer to Centralia and to maintain their terms and conditions of employment." *Id.* However, UNFI argued that not all terms from the CBAs "[c]ould exist for the transferred employees without a [collective bargaining] contract," which in turn would require majority support at the new location, such that the "majority support" provision must be read as a precondition to applying the terms of the CBAs to transferred employees as provided in the first two sentences of the Movement Provision. *Id.* at 13, 19.

Addressing that argument, the arbitrator found that the "terms of the contract" referenced in the first two sentences of the Movement Provision could "reasonably be interpreted to mean the wages, hours, benefits and working conditions contained in the Agreement." *Id.* at 19. He reasoned that the Provision "allows the employees to follow the work to the new location and avoid having to face a reduced standard of living to do so." *Id.* The arbitrator also rejected UNFI's argument that it could not continue to make payments to the Pension Trust Fund without a contract in place, noting that UNFI's witness testified during the hearing that based on his experience as a Trustee of the Trust, the Trust could approve continuation of contributions and benefits even though no contract was in place during a transition period. *Id.* at 19.

Having found that the Movement Provision contained an "express promise" to "apply the terms of the contract and afford all employees working under the terms of the Agreement at the Tacoma facility the opportunity to work at the Centralia facility under the same terms and

conditions and without any loss of seniority of other contractual rights or benefits," the arbitrator concluded that UNFI violated the Movement Provision when it failed to "afford all [Tacoma] employees . . . the opportunity to work at the Centralia facility under the same terms and conditions and without any loss of seniority or other contractual rights or benefits pending resolution of the question concerning representation at Centralia." Dkt. No. 1-1 at 19. Accordingly, the Award imposed the following remedy:

> 1. Allow employees at the Tacoma facility to transfer to Centralia under the same terms and conditions that they have in Tacoma; and
>
> 2. Reinstate, make whole and also allow any employees laid off in the first wave(s) of layoffs in Tacoma to transfer to Centralia under the same terms and conditions that they had in Tacoma.

Dkt. No. 1-1 at 21.

## C.    UNFI sues

On October 28, 2019, UNFI filed a complaint in this Court against the Unions to vacate the Award. Dkt. No. 1. The Unions counterclaimed under the Labor Management Relations Act, 29 U.S.C. § 185 ("LMRA"), seeking to confirm and enforce the Award and to obtain relief from UNFI's alleged breach of the CBAs. Dkt. No. 9 at 9–15.

The Court issued a scheduling order, but declined to set a discovery deadline based on the parties' representation in their Joint Status Report that there was no need for discovery related to the liability phase of this case. Dkt. No. 37 at 1. The Court ordered that the record for the liability phase would consist of the Award, the arbitration hearing transcript, the exhibits introduced at the arbitration hearing, UNFI's unfair labor practice charge against the Unions filed with the National Labor Relations Board ("NLRB" or the "Board"), any rulings on that charge, portions of the NLRB record before deemed relevant by either party, and correspondence between the parties regarding employment offers that UNFI extended to former employees of the Tacoma facility. *Id.* at 1–2.

1    The Court further issued a briefing schedule for the parties' cross-motions for summary judgment

2    on the issue of liability, and noted that if the Court found for the Unions on the issue of liability, it

3    would subsequently set pretrial deadlines, including a 120-day deadline for the parties to complete

4    discovery related to damages. *Id.* at 2.

5    **D.      Proceedings before the NLRB and related court filings**

6            In addition to this lawsuit, UNFI filed an unfair labor practice charge with the NLRB

7    alleging that the Award violated Sections 8(b)(1)(A), 8(b)(2), and 8(b)(3) of the National Labor

8    Relations Act ("NLRA"). Dkt. No. 25 at 5. UNFI then filed a motion to stay this case pending

9    resolution of the unfair labor practice charge, Dkt. No. 24, which the Court initially denied, Dkt.

10   No. 36.

11           UNFI moved the Court to reconsider its decision when the NLRB subsequently issued a

12   Consolidated Complaint against the Unions alleging that they violated NLRA Sections 8(b)(1)(A),

13   8(b)(2) and 8(b)(3) by (1) seeking to enforce the CBAs despite not representing a majority of the

14   employees at Centralia; (2) "attempt[ing] to cause UNFI to discriminate against its Centralia

15   employees on the basis of Union representation"; and (3) seeking to represent certain employees—

16   i.e., former Tacoma employees—at Centralia. Dkt. No. 39-1 at 15. With the Court's permission,

17   Dkt. No. 53, the NLRB filed an *amicus curie* brief, Dkt. No. 42-1. The NLRB urged the Court to

18   stay the case because UNFI's unfair labor practice complaint involved representational issues that

19   were within the Board's primary jurisdiction and because the issue of contract interpretation was

20   inextricably linked with the unfair labor practice allegations. Dkt. No. 42-1 at 6–14. "To avoid

21   conflicting outcomes and in the interest of judicial economy," the Court granted a stay pending the

22   NLRB's resolution of the representation issues. Dkt. No. 53 at 2–3.

23           On June 29, 2021, the NLRB filed a status report informing the Court that the Regional

24   Director of NLRB Region 19 in Seattle, acting at the direction of the Acting General Counsel, had

withdrawn the complaint against the Unions and dismissed the unfair labor practice charge. Dkt. No. 54 at 1. The Regional Director's order explained that President Biden removed the former General Counsel—under whose authority the Director issued the Consolidated Complaint—and that the Acting General Counsel did "not wish to continue the prosecution" of the case after a review and re-examination of the allegations. Dkt. No. 54-1 at 2. UNFI filed a request for special permission to appeal the withdrawal of the complaint against the Unions, and the NLRB denied that request on May 11, 2021. *See* Dkt. No. 55 at 2–3. On June 22, 2021, the Acting General Counsel denied UNFI's appeal of the Regional Director's order withdrawing the complaint against the Unions. Dkt. No. 56 at 5–7; *see also id.* at 6–7 (noting that, as to the merits of the parties' dispute, "[t]he evidence does not show that the representational status of the Unions is at issue" and "[t]he Board has upheld the transfer of contractual provisions into new bargaining relationships once the original unit no longer exists because certain rights are enforceable 'vestiges' of the expired contract."). Because the NLRB matter had concluded, the Court lifted the stay. Dkt. No. 58.

A week after the stay was lifted, UNFI submitted a petition for review of the NLRB's May 11, 2021 order to the Fifth Circuit Court of Appeals. Dkt. No. 59-1.[3] UNFI requested that this Court reinstate the stay based on their appeal, and the Court denied that motion. Dkt. Nos. 59, 69. The parties subsequently filed cross motions for summary judgment. Dkt. Nos. 70–71.

## II.    DISCUSSION

### A.    Jurisdiction

The Court has jurisdiction to hear "[s]uits for violation of contracts between an employer and a labor organization representing employees" based on Section 301 of the LMRA. 29 U.S.C.

---

[3] The Fifth Circuit heard oral argument on June 6, 2022. *United Natural Foods v. NLRB*, No. 21-60532; oral argument available at https://www.ca5.uscourts.gov/OralArgRecordings/21/21-60532_6-6-2022.mp3.

§ 185(a); *see, e.g., Sprewell v. Golden State Warriors*, 266 F.3d 979, 986 (9th Cir. 2001). Section 301 also empowers the Court to review an arbitration conducted under the terms of a collective bargaining agreement. *See Sprewell*, 266 F.3d at 986.

**B.     Summary Judgment Standard**

Summary judgment is appropriate only when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The Court does not make credibility determinations or weigh the evidence at this stage. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986). The sole inquiry is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251–52.

A court presented with cross-motions for summary judgment should review each motion separately, giving the nonmoving party for each motion the benefit of all reasonable inferences from the record. *Ctr. for Bio-Ethical Reform, Inc. v. Los Angeles Cnty. Sheriff Dep't*, 533 F.3d 780, 786 (9th Cir. 2008). To the extent that the Court resolves factual issues in favor of the nonmoving party, this is true "only in the sense that, where the facts specifically averred by that party contradict facts specifically averred by the movant, the motion must be denied." *Lujan v. Nat'l Wildlife Fed'n*, 497 U.S. 871, 888 (1990).

The Court will, however, enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). Once the moving party has carried its burden under Rule 56(c), "the nonmoving party must come forward with 'specific facts showing that there is a genuine issue for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (quoting Fed. R. Civ. P. 56(e)) (emphasis omitted). Metaphysical doubt is insufficient, *id.* at 586, as are conclusory, non-specific

1   affidavits, *Lujan*, 497 U.S. at 888–89. Nor is it the Court's job to "scour the record in search of a

2   triable issue of fact"; rather, the nonmoving party must "identify with reasonable particularity the

3   evidence that precludes summary judgment." *Kennan v. Allan*, 91 F.3d 1275, 1279 (9th Cir. 1996)

4   (internal quotation marks and citation omitted); *accord Carmen v. San Francisco Unified Sch.*

5   *Dist.*, 237 F.3d 1026, 1029 (9th Cir. 2001).

6   **C.**   **Motions for Summary Judgment**

7        In their motions for summary judgment, the parties dispute whether the Award should be

8   vacated or enforced. *See generally* Dkt. Nos. 70, 71. UNFI argues that the Award should be vacated

9   because it fails to draw its essence from the CBAs and violates the NLRA. Dkt. No. 71 at 8–9, 13–

10   23. UNFI also argues that the Unions' actions and attempts to enforce the Award are "arguably

11   prohibited" by the NLRA. Dkt. No. 71 at 9, 14, 23–24. The Unions ask the Court to enforce the

12   Award and declare that UNFI breached the CBAs by failing to abide by the arbitrator's decision.

13   *See generally* Dkt. No. 70. The Court heard oral argument on the parties' motions on April 26,

14   2022. Dkt. No. 78. For the reasons laid out below, the Unions have the better of the arguments.

15        "Because of the centrality of the arbitration process to stable collective bargaining

16   relationships, courts reviewing labor arbitration awards afford a nearly unparalleled degree of

17   deference to the arbitrator's decision." *Sw. Reg'l Council of Carpenters v. Drywall Dynamics, Inc.*,

18   823 F.3d 524, 530 (9th Cir. 2016) (internal citation and quotation marks omitted). "[A]s long as

19   the arbitrator is even arguably construing or applying the contract and acting within the scope of

20   his authority, that a court is convinced he committed serious error does not suffice to overturn his

21   decision." *United Paperworkers Int'l Union v. Misco, Inc.*, 484 U.S. 29, 38 (1987). This is because

22   "[i]t is the arbitrator's construction" that the parties "bargained for," and "so far as the arbitrator's

23   decision concerns construction of the contract, the courts have no business overruling him because

24   their interpretation of the contract is different from his." *United Steelworkers of Am. v. Enterprise*

*Wheel & Car Corp.*, 363 U.S. 593, 599 (1960). The Court does not determine "whether the arbitrator's interpretation of the agreement was 'plausible,' in the sense of one a court might render, but instead whether he made any interpretation or application of the agreement at all. If so, the court's inquiry ends." *Sw. Reg'l Council of Carpenters*, 823 F.3d at 531–32; *id.* at 532 ("the relevant inquiry is simply whether the arbitrator's decision concerns construction of the contract, not an evaluation of the merits of that construction.") (cleaned up).

Under that deferential standard, a court may properly vacate an arbitrator's award:

> (1) when the award does not draw its essence from the collective bargaining agreement and the arbitrator is dispensing his own brand of industrial justice; (2) where the arbitrator exceeds the boundaries of the issues submitted to him; (3) when the award is contrary to public policy; or (4) when the award is procured by fraud.

*S. Cal. Gas Co. v. Util. Workers Union of Am., Local 132, AFL-CIO*, 265 F.3d 787, 792–93 (9th Cir. 2001). The "burden of establishing grounds for vacating an arbitration award is on the party seeking it." *U.S. Life Ins. Co. v. Superior Nat'l Ins. Co.*, 591 F.3d 1167, 1173 (9th Cir. 2010).

Here, UNFI fails to satisfy its burden.

1.  The Arbitrator Did Not Exceed his Authority

As the arbitrator observed, the facts of this case create "difficulties" construing the Movement Provision. Dkt. No. 1-1 at 12–13. The CBAs require that "the terms of [the CBAs] shall continue to apply with respect to the new facility," and that employees working under the CBAs "be afforded the opportunity to work at the new facility under the same terms and conditions." Dkt. No. 1-2 at 6. At the same time, the CBAs mandate that "[t]he designated Union will be required to show a majority representation in accordance with controlling law." *Id.*

With a short-distance move, satisfaction of all three sentences appears easily obtainable. As counsel for UNFI explained at oral argument, "[i]f you have a facility that moves from one location, three blocks away, it stands to reason that, first, the union would be able to establish

majority support among the employees that would be working at that facility," and then "all of [the Movement Provision's] terms, including those that relate to union representation, would also apply at the new facility." Oral Arg. Drft. Tr. at 9. But "[i]f you have what occurred here, which is the facility being moved 55 miles away," there is a potential that "the requirement in sentence 3 [of majority representation] cannot be satisfied[.]" *Id.* at 10. In UNFI's view, such a failure means that the first two sentences of the Movement Provision simply could not apply. *Id.* Contemplating such a result, however, the arbitrator pondered why the parties "provide[d] in the first two sentences that rights and benefits 'shall' apply" but did "not make clear in those sentences that the rights and benefits are conditioned on showing majority support[.]" Dkt. No. 1-1 at 13.

These quandaries are precisely why labor arbitrators play such a "critical role" in the context of a collective bargaining agreement. *Sw. Reg'l Council of Carpenters*, 823 F.3d at 529. Such agreement is "a skeletal, interstitial document" that is not intended to be "a comprehensive distillation of the parties' bargain" like a commercial contract. *Stead Motors of Walnut Creek v. Auto. Machinists Lodge No. 1173, Int'l Ass'n of Machinists & Aerospace Workers*, 886 F.2d 1200, 1205 (9th Cir. 1989). The labor arbitrator's role is accordingly "somewhat different from that served by the arbitrator in the commercial context." *Id.* The labor arbitrator "is the person the parties designate to fill in the gaps," as "their joint *alter ego* for the purpose of striking whatever supplementary bargain is necessary" to handle matters omitted from the agreement. *Id.* (cleaned up). Labor arbitration is thus "a critical aspect of the parties' bargain" because it is "the means through which they agree to handle the anticipated unanticipated omissions of the collective bargaining agreement." *Id.* (cleaned up); *see also United Steelworkers of Am. v. Warrior & Gulf Nav. Co.*, 363 U.S. 574, 578 (1960) ("*Warrior & Gulf*") ("The collective bargaining agreement . . . . is more than a contract; it is a generalized code to govern a myriad of cases which the draftsmen cannot wholly anticipate.").

1       That is the function that the arbitrator served here. Faced with a factual circumstance the

2  parties may not have fully anticipated and CBAs that did "not give a completely clear picture of

3  what the Parties intended," the arbitrator construed the CBAs' terms in the context of the long-

4  distance move by considering what the parties were "trying to accomplish with this provision."

5  Dkt. No. 1-1 at 13. He observed that "the Union's goal during the negotiation of the [Movement

6  Provision] was to allow the employees to follow the work to a new location," and that an UNFI

7  witness's testimony established that it "did not want to agree 'to do what is more than [it] can

8  legally do under board law.'" Dkt. No. 1-1 at 15–16 (noting that UNFI's witness agreed that it was

9  free to set terms and conditions of employment absent a collective bargaining agreement).

10  Ultimately, the arbitrator satisfied each side's goals by construing the first two sentences to require

11  that only those "terms" relating to wages, hours, and working conditions be applied to employees

12  who transferred to the Centralia facility. Dkt. No. 1-1 at 19; *see also Warrior & Gulf*, 363 U.S. at

13  582 ("The parties expect that [the arbitrator's] judgment . . . will reflect not only what the contract

14  says but, insofar as the collective bargaining agreement permits, such factors as the effect upon

15  productivity of a particular result, its consequence to the morale of the shop, his judgment whether

16  tensions will be heightened or diminished.").

17       UNFI contends that this result impermissibly "reinvents" the parties' agreement. Dkt. No.

18  74 at 9. In UNFI's view, "terms" clearly means "*all* 'terms' set forth in the parties' agreement,"

19  and the arbitrator was not free to deviate from that plain meaning. *Id.* at 15–16 (emphasis in

20  original). But despite the arbitrator having "no power to add to or subtract from or to disregard,

21  modify or otherwise alter any terms" of the CBAs, he "overtly disregarded the contract 'terms'

22  dealing with union representation" when he "impos[ed] all *other* contract 'terms' on Centralia

23  employees who transferred from Tacoma" and gave "no effect to the Tacoma contract language

24  requiring the Unions to 'show majority representation[.]'" Dkt. No. 71 at 8; *see also id.* at 18–23.

1    UNFI asks the Court to reach too far. The Court's task "is to determine *whether* the

2    arbitrator interpreted the collective bargaining agreement, *not* whether he did so correctly." *Hawaii*

3    *Teamsters & Allied Workers Union, Loc. 996 v. United Parcel Serv.*, 241 F.3d 1177, 1178 (9th

4    Cir. 2001) (emphasis in original). Thus, the key question "is a simple binary one: Did the arbitrator

5    look at and construe the contract, or did he not?" *Sw. Reg'l Council of Carpenters*, 823 F.3d at

6    532.

7    He did. Although the arbitrator was not free to disregard or rewrite contract language, he

8    was empowered to interpret that language. Dkt. No. 1-2 at 23 (including within the powers of the

9    arbitrator "interpretations of and a decision concerning appropriate application of the terms of this

10   Agreement"); *see also, e.g., Enterprise Wheel*, 363 U.S. at 597; *Campbell v. Nevada Prop. 1 LLC*,

11   No. C2:10-02169-APG, 2013 WL 6118622, at *3 (D. Nev. Nov. 20, 2013) ("Absent a definition,

12   arbitrators have the authority to interpret contract terms."); *United Parcel Serv. Int'l Brotherhood*

13   *of Teamsters,* 2006 WL 2137146, at *3 (W.D. Wash. 2006) ("[T]he arbitrator was completely

14   within his authority to interpret a term of the contract as he saw fit; this Court's job on review is

15   to determine whether he was within the confines of the agreement and the issue as it was framed

16   for him, not whether he interpreted a term of the contract 'correctly.'"). The arbitrator accordingly

17   interpreted the sentences in the Movement Provision to determine what the "terms" included.

18   The Movement Provision does not state that "all" of the terms contained in all provisions

19   of the CBAs shall continue to apply at the new facility. *See* Dkt. No. 1-2 at 6. Nor do the CBAs

20   define "terms" or "terms and conditions." *See generally* Dkt. No. 1-2. The arbitrator did not exceed

21   his authority simply by adopting a narrower construction of "terms" than UNFI urges. *See, e.g.*,

22   *McClatchy Newspapers v. Central Valley Typographical Union No. 46*, 686 F.2d 731, 733 (9th

23   Cir. 1982) (where parties empowered arbitrator to interpret the scope of the words "strike or

24   lockout" in their agreement, arbitrator did not exceed his powers by interpreting the term "strike"

to encompass only primary strikes and not sympathy strikes); *see also Stead Motors,* 886 F.2d at 1205 ("Since the labor arbitrator is designed to function in essence as the parties' surrogate, he cannot 'misinterpret' a collective bargaining agreement"; in this sense, "his award *is* their contract.") (cleaned up). Indeed, the arbitrator gave effect to the CBAs' specific language promising that employees "shall" be afforded the opportunity to work at the new facility "without any loss of seniority" or "other contractual rights or benefits." Dkt. No. 1-1 at 7. The Award derived its essence from that language by concluding it contained an "express promise" to the employees to continue those benefits.

At the same time, the arbitrator gave effect to the majority representation language. He considered testimony from the UNFI witness that such language was inserted because UNFI did not want to overstep its bounds under the law, and he noted that this witness agreed that "nothing prevents [UNFI] from agreeing to allow the employees from Tacoma to transfer to Centralia and to maintain their terms and conditions of employment." Dkt. No. 1-1 at 15. UNFI does not dispute that the Tacoma employees do not require union representation to enforce their personal economic rights—i.e., the CBA terms relating to wages, hours, and working conditions. The arbitrator accounted for the majority representation language in his finding that the Movement Provision requires UNFI to afford Tacoma employees "the opportunity to work at the Centralia facility" under the same terms and conditions "pending resolution of the question concerning representation at Centralia." *See* Dkt. 1-1 at 19. This finding suggests that he agreed with the Unions' contention that the parties' bargain in the Movement Provision was "to maintain the status quo of wages and benefits at least until majority status is determined." *Id.* at 18. The award does not prevent whichever union acquires majority support at Centralia from negotiating a contract at that time, obviating UNFI's concern that such union "would be administering a contract that was stripped of all provisions relating to union representation." Dkt. No. 74 at 19.

For all of the foregoing reasons, the Award demonstrates that the arbitrator considered the language of the Movement Provision, did not ignore or subtract parts of it, and construed the majority representation sentence in relation to the other sentences in the Movement Provision.[4] Therefore, the Court's inquiry ends. *Sw. Reg'l Council of Carpenters*, 823 F.3d at 532.

       2.    <u>Enforcement of the Award Does Not Violate the NLRA</u>

UNFI argues that the Award is unenforceable because it requires UNFI to take actions that are unlawful under NLRA Sections 8(b)(1)(A), 8(b)(2), and 8(b)(3). Dkt. No. 71 at 23–30. These sections prohibit a labor organization from:

- restraining or coercing employees in the exercise of rights guaranteed under 29 U.S.C. §157, including the "right to self-organization, to form, join, or assist labor organizations, to bargain collectively through representatives of their own choosing," 29 U.S.C. § 158(b)(1)(A);

- "caus[ing] or attempt[ing] to cause an employer to discriminate against an employee in violation of subsection (a)(3) or to discriminate against an employee with respect to whom membership in such organization has been denied or terminated" on grounds other than failure to pay membership dues or fees, 29 U.S.C. § 158(b)(2); and

- "refus[ing] to bargain collectively with an employer, provided it is the representative of his employees subject to the provisions of [29 U.S.C. § 159]," 29 U.S.C. § 158(b)(3).

According to UNFI, the Award violates the above provisions by (1) imposing Tacoma contract terms in Centralia without any showing of majority support in Centralia for the Tacoma

---

[4] UNFI also argues that the arbitrator failed to construe the "New Operation" clause. Dkt. No. 74 at 24 & n.30 (citing Dkt. No. 72-1 at 338 (§ 1.01.1), 598 (§ 1.4)). But neither party requested that he construe that clause; instead, both parties listed the Movement Provision as the only provision at issue. *See* Dkt. No. 1-1 at 3; Dkt. No. 72-1 at 10. Even so, it is apparent that the arbitrator considered and rejected UNFI's argument with respect to the New Operation clause. *See* Dkt. No. 1-1 at 10 n.1, 11; Dkt. No. 72-1 at 15–16; *see also A.G. Edwards & Sons, Inc. v. McCollough*, 967 F.2d 1401, 1403 (9th Cir. 1992) ("[A]rbitrators are not required to state the reasons for their decisions.").

Unions; and (2) requiring UNFI to discriminate by subjecting some Centralia employees to different economic terms based on whether they were covered by the CBAs in Tacoma, without a determination of appropriate bargaining units in Centralia. Dkt. No. 71 at 25–30.

The Unions argue that UNFI conflates the conditions necessary to negotiate and enter into a collective bargaining agreement with those necessary to enjoy and enforce existing contractual rights. *See* Dkt. No. 73 at 8. The Unions contend that the "uniquely personal" rights of transferred employees that arose in Tacoma are enforceable after those employees leave. *Id.* at 8–11.

It is undisputed that the Unions have not made a demand to represent the Centralia employees. *See, e.g.*, *id.* at 12; Dkt. No. 76 at 14. The issue is whether such representation is required in order to enforce the Award.

Before a union can represent an appropriate unit of employees, it must be certified to do so. *See* 29 U.S.C. § 159(a)–(b). Certification is warranted after the union shows majority support from the unit in question. *See id.* And at that point, the unit is exclusively represented by that union. 29 U.S.C. § 159(a). The union is then free to negotiate collective bargaining agreements, including "provisions designed to protect employees against involuntary transfer or against adverse consequences resulting from either voluntary or involuntary transfers." *United Food & Com. Workers Union v. Alpha Beta Co.*, 736 F.2d 1371, 1379 (9th Cir. 1984). These protections do not necessarily die upon an employee's transfer; indeed, such a demise would seem to render these rights meaningless. *See id.* at 1378. But they don't necessarily survive, either.

In certain limited circumstances that the Ninth Circuit has described as "the exception to the rule," these protections must yield to collective interests. *Id.* at 1379. Specifically, the exception carries the day when enforcing the transferees' rights "would create an irreconcilable conflict with, or adversely affect, the rights of the other employees in the unit to which the transfer is made." *Id.* Such a conflict would arise if, for example, the transferees' rights required "super-seniority for

1   transferred employees in the face of a collective bargaining agreement at their new unit that

2   prohibited the granting of such seniority" or "continued representation by the transferred

3   employees' former bargaining representative without a showing of majority status." *Id*.

4       UNFI disputes that the CBAs' economic terms can survive the dissolution of the Tacoma

5   bargaining units. Relying on *Sperry Systems Mgt. Div. v. NLRB*, 492 F.2d 63 (2d Cir. 1974), UNFI

6   argues that "even if an arbitrator selectively discards contract clauses about union 'representation,'

7   applying other contract terms at a distant location, absent union majority support, still unlawfully

8   'imposes on employees of one unit the contract and bargaining agent of another unit.'" Dkt. No.

9   71 at 20 (quoting *Sperry*, 492 F.2d at 68–69). However, *Sperry* and the other cases upon which

10  UNFI relies are inapposite. *See Carpenters Local 1478 v. Stevens*, 743 F.2d 1271, 1277 (9th Cir.

11  1984) (declining to uphold an arbitration award "premised on the application of the labor

12  agreement to [an entity involved in a double-breasted situation] when previous Board proceedings

13  establish that [the entity] is not bound by the agreement"); *Houston Div. of the Kroger Co.*, 219

14  NLRB 388, 389 & n.6 (1975) (holding that a union must demonstrate majority support among

15  employees of new or after-acquired stores before it can be recognized, even where the employer

16  waived its right to demand an election in such stores); *NLRB v. Retail Clerks Local 588*, 587 F.2d

17  984, 986–87 (9th Cir. 1978) ("[W]hen a new store is opened, union representation cannot be forced

18  on the new employees; they must be allowed to decide their own representation."). Unlike in those

19  cases, the Award here did not impose an entire CBA—or any of the CBAs' terms—on employees

20  who were never represented by the Unions. It did not attempt to accrete employees into another

21  bargaining unit, allow the Unions to negotiate terms on their behalf, or apply the CBAs' terms to

22  new employees at the Centralia facility.

23      Instead, the Award applies the Tacoma employees' economic rights—which arose under

24  the CBAs in force in Tacoma—only to former Tacoma employees at the new facility "pending

resolution of the question concerning representation at Centralia." Dkt. No. 1-1 at 18–19. This result is consistent with the Ninth Circuit's holding in *Alpha Beta*. There, the court considered whether an employer was required to continue to make trust fund contributions to employees after they transferred to a new store operated by the same employer. 736 F.2d at 1375–81. The employer argued, as UNFI does here, that continuing the disputed benefit to transferred employees would infringe upon the right of the employees at the new store to self-organization. *Id.* at 1376. The Ninth Circuit rejected that argument and held that the unions were "seek[ing] only to enforce rights of transferred employees—rights that arose under an agreement in force at their initial place of work"—rather than trying to represent employees outside the bargaining unit. *Id.* at 1378.

Of particular relevance here, the court in *Alpha Beta* explained that "[t]here is no reason in federal labor law or policy why employees may not be guaranteed that they will continue to receive *most* of the economic benefits they received prior to their transfer in the event that for any reason their work locale is changed." 736 F.2d at 1379. (emphasis in original). For example, "[t]he payment of wages to transferred employees at a higher, protected rate does not interfere with any rights of the other employees in the new unit." *Id*. And "[a]s in the case of wages, there is also ordinarily no conflict with respect to most of the other economic benefits." *Id.* The court found that the arbitrator's ability to limit the provision at issue could prevent the union's continued contributions from causing "the fragmenting of employees into separate groups based on past employment history" once "another union has been certified to represent employees at the new store." *Id.* at 1380. Although "a certified union has the right or obligation under federal labor law to bargain for a single health and welfare or other benefit plan covering all the employees in a bargaining unit" such that the fragmenting of employees "would have an adverse effect on the bargaining rights of the employees as a whole," the arbitrator "could well find that the life of the provision is limited." *Id.* "He could, for example, construe the provision as requiring the employer

1    to make the trust fund contributions for a reasonable period of time—a period long enough to allow

2    the transferred employees to make satisfactory arrangements for new benefits," or construe it "as

3    requiring contributions until either the expiration of the collective bargaining agreement or the

4    certification of a bargaining agent at the [new] store, whichever occurs earlier." *Id*. Both

5    constructions "would avoid any possible conflict that might arise upon certification of a bargaining

6    representative at the [new] store, and both constructions would, in all other respects as well, be

7    lawful." *Id.* Wholly consistent with these example constructions is the arbitrator's finding here that

8    the Tacoma employees' economic rights would endure "pending resolution of the question

9    concerning representation at Centralia." Dkt. No. 1-1 at 19.

10        While it is true that some Centralia employees could be subject to different economic

11   conditions based on whether they were previously covered by the CBAs, the NLRA does not

12   prohibit all distinctions among employees' economic conditions. Rather, the NLRA prohibits

13   discrimination "to encourage or discourage membership in any labor organization." 29 U.S.C.

14   § 158(a)(3). The differing conditions in this case are not the result of UNFI discriminating for the

15   purpose of encouraging or discouraging membership in a labor organization. The rights arose in

16   Tacoma and are therefore not dependent upon whether any employee at Centralia supports

17   unionization. Moreover, new non-union employees at Centralia are not precluded from having the

18   same economic terms if UNFI decides to provide them to new hires. *See* Dkt. No. 1-1 at 15.

19   Therefore, the Award does not encourage or discourage union membership or require UNFI to

20   discriminate against groups of employees based on their union membership.

21        UNFI further alleges that honoring Tacoma transferees' seniority would necessarily

22   disadvantage new hires at the Centralia facility. Dkt. No. 71 at 30. But "the Board and courts have

23   long held that an employer and a union may properly agree to give employees entering a bargaining

24   unit credit for seniority accrued in another bargaining unit of the same employer, as long as the

benefit is extended uniformly." *See, e.g.*, *Teledyne Indus., Inc.*, No. C30-CB-2389, 1986 WL 65493, at *5 (N.L.R.B.G.C. Apr. 10, 1986); *see also Anheuser-Busch, Inc.*, 296 NLRB 1025, 1027-29 (1989) (holding that sections 8(b)(1)(A) and 8(b)(2) were not violated by allowing cross-facility bumping rights following employers' withdrawal from a multiemployer unit even though the multiemployer "unit ha[d] long since ceased to exist for contract bargaining purposes"). Indeed, the Board has upheld an agreement with one union to give its members portable seniority rights upon their transfer to a separate unit, even though unions representing employees in other units waived the same right in their agreements, and even though this meant that employees transferring into the separate unit from different unions were treated differently with respect to receiving seniority credit. *Hough Div. of Int'l Harvester*, 209 NLRB 357, 359–60 (1974). The Board concluded that there was "nothing coercive or discriminatory" about the arrangement because the employees from the units that waived the right "never had any vested portable seniority rights at the time of transfer." *Id.* at 360.

Consistent with *Hough*, the Ninth Circuit observed in *Alpha Beta* that although "[n]ormally there is no conflict between the bargained-for rights of transferred employees and the rights of others in the unit to which they are transferred," a conflict could arise with respect to seniority if such rights "require[ed] super-seniority for transferred employees in the face of a collective bargaining agreement at their new unit that prohibited the granting of such seniority." 736 F.2d at 1379. But no such "irreconcilable conflict" exists here. *Id.* The Unions understand the seniority rights to apply "only amongst Tacoma employees," meaning that the right governs "the relative seniority amongst the workers coming in [from Tacoma], not in relation to any new hires." Oral Arg. Drft. Tr. at 25–26. Therefore, Tacoma employees' seniority rights do not clash with those of the new Centralia employees, and it is not impermissible for the Award to extend seniority rights

1  to the transferred employees.[5]

2        For those reasons, the Award does not require UNFI to violate the NLRA as it alleges.

3        3.    The NLRB's Primary Jurisdiction and *Garmon* Preemption

4        UNFI argues in the alternative that the Court should grant summary judgment in its favor

5  "in deference to the NLRB's primary jurisdiction to address the NLRA issues that are in dispute

6  here, especially since the NLRB's failure to address the merits of the claims against the Union

7  remain pending in UNFI's appeal filed with the Court of Appeals for the Fifth Circuit." Dkt. No.

8  71 at 30. UNFI emphasizes that "[t]he Supreme Court in [*San Diego Bldg. Trades Council,*

9  *Millmen's Union, Loc. 2020 v.*] *Garmon*[, 359 U.S. 236 (1959)] indicated that courts should defer

10  to the NLRB when conduct is 'arguably' prohibited by the NLRA, because 'Congress has entrusted

11  administration of the labor policy for the Nation to a centralized administrative agency[.]'" Dkt.

12  No. 71 at 30–31 (citing *Garmon*, 359 U.S. at 245).

13        However, the Supreme Court subsequently clarified that when "the activity in question also

14  constitutes a breach of a collective-bargaining agreement, the Board's authority is not exclusive

15  and does not destroy the jurisdiction of the courts in suits under § 301." *William E. Arnold Co. v.*

16  *Carpenters Dist. Council of Jacksonville & Vicinity*, 417 U.S. 12, 16 (1974) (cleaned up). Because

17  "Congress deliberately chose to leave the enforcement of collective agreements to the usual

18  processes of the law," the *Garmon* doctrine "is not relevant to actions" such as this one that are

19  "within the purview of § 301." *Id.* (cleaned up); *see also* Dkt. No. 1 at 3.

20        The NLRB has primary jurisdiction only in cases involving "representational issues," and

21  lacks jurisdiction to consider cases arising from the breach of a current collective bargaining

22

23       [5] The Unions proffer yet another reason why the Award does not conflict with union representation at Centralia: the CBAs' terms remained in effect only until the earlier of "the expiration of the parties' CBAs in July 2021, or the resolution of [majority support] in Centralia." Oral Arg. Drft. Tr. at 21. Because the CBAs have expired, whatever

24  conflict they may have engendered at Centralia with respect to future unionization is no longer a concern.

1  agreement. Dkt. No. 36 at 3. Labor disputes focusing on the interpretation of the terms of the

2  collective bargaining agreement are left to the courts to decide under the LMRA. *United Ass'n of*

3  *Journeymen & Apprentices of Plumbing & Pipefitting Indus., Steamfitters & Refrigeration Union,*

4  *Loc. 342, AFL-CIO v. Valley Engineers*, 975 F.2d 611, 614 (9th Cir. 1992). Therefore, whether

5  the NLRB has primary jurisdiction depends on whether "the major issues to be decided can be

6  characterized as primarily representational or primarily contractual." *Id.* (cleaned up). "Where the

7  interpretation of the contract depends entirely on the resolution of the question of whom the union

8  represents, the matter is properly left to the Board." *Id.* (cleaned up). And "[w]hen a labor dispute

9  involves both a breach of contract and an unfair labor practice charge, the NLRB and the courts

10 have concurrent jurisdiction." *Sheet Metal Workers Int'l Ass'n, Local No. 162 v. Jason Mfg., Inc.*,

11 900 F.2d 1392, 1400 (9th Cir. 1990).

12      As the Court previously held, "[t]he NLRB's withdrawal of the complaint and dismissal of

13 the unfair practice charge against the Unions . . . places this dispute fully within the primary

14 jurisdiction this Court as a contractual dispute," and e even if the Fifth Circuit were to reverse and

15 remand the NLRB order for further consideration by the Board, this Court would still have

16 concurrent jurisdiction over the issues. Dkt. No. 69 at 5–6; *see also* Dkt. No. 36 at 4. The Court's

17 prior order is the law of the case, and UNFI has not presented any new facts or reasons to depart

18 from it. Therefore, UNFI's alternative request for summary judgment based on deference to the

19 NLRB or based on its primary jurisdiction is denied.

20      4.      UNFI did not Breach the CBAs by Seeking to Vacate the Award and Filing an
                Unfair Labor Practice Charge

21

22      The Unions ask the Court to declare that UNFI breached the CBAs by seeking to vacate

23 the Award in the instant lawsuit and by collaterally attacking the Award through an unfair labor

24 practice charge. Dkt. No. 70 at 24–26. The Unions emphasize the CBAs' mandate that "final

decisions of a Board or Arbitrator" "shall be absolute and final and binding on the Union . . . and the Employer," and "[f]ailure to abide by the final decision of a Board or Arbitrator shall be a violation of this Agreement." *See* Dkt. No. 1-2 at 23; Dkt. No. 1-3 at 12. In the Unions' view, UNFI waived its right to judicial review through these provisions. Dkt. No. 70 at 24–26.

UNFI counters that the language of the CBAs permitted it to seek judicial review of the Award. Dkt. No. 74 at 29. Because the "Limited Powers" provision indicates that the arbitrator "shall have no power to add to or subtract from or to disregard, modify or otherwise alter any terms of [the CBAs]," Dkt. No. 1-2 at 23, UNFI reasons that it is "implausible" to interpret the language as prohibiting a challenge to an arbitrator who overreaches, Dkt. No. 74 at 29.

As the Unions acknowledge in their motion for summary judgment, a waiver must be "unequivocal and clearly expressed." Dkt. No. 70 at 25 (citing *Phil Wall & Sons Distrib.*, 287 NLRB 1161, 1166 (1988)). Indeed, the Ninth Circuit has held that a clause providing that arbitration was to be "final and binding" did not show clear intent to eliminate judicial review of the arbitrator's decision. *Aerojet–General Corp. v. American Arbitration Association,* 478 F.2d 248, 251–52 (9th Cir. 1973); *see also In re Wal-Mart Wage & Hour Emp. Pracs. Litig.*, 737 F.3d 1262, 1268 (9th Cir. 2013) ("Permitting parties to contractually eliminate all judicial review of arbitration awards would not only run counter to the text of the FAA, but would also frustrate Congress's attempt to ensure a minimum level of due process for parties to an arbitration.").[6] And more recently, the Ninth Circuit held that a union was not entitled to an award of attorney's fees after the employer did not implement the arbitrator's award, reasoning that the employer "sought judicial review of the award, as was its right," and therefore could not be said to have "refuse[d]

---

[6] Although the Ninth Circuit has not yet addressed whether the FAA applies to arbitration of collective bargaining agreements, courts may nevertheless "look to the FAA for guidance." *Int'l All. of Theatrical Stage Emp. & Moving Picture Technicians Artists, & Allied Crafts of the United States, Its Trusteed Loc. 720 Las Vegas, Nevada v. InSync Show Prods., Inc.*, 801 F.3d 1033, 1039 (9th Cir. 2015).

to abide by the arbitrator's award." *Holsum Bakery, Inc. v. Bakery, Confectionery, Tobacco Workers & Grain Millers, Local 232*, 699 Fed. App'x 690, 691 (9th Cir. 2017). Although not mentioned in the Ninth Circuit decision in *Holsum Bakery*, the collective bargaining agreement at issue had nearly identical provisions to those at issue here. Specifically, it provided that "[the arbitrator] shall have no authority to add to, subtract from, supplement or modify this Agreement," and that "his decision shall be final and binding on the Company, the Union and the Associate(s)[.]" *Holsum Bakery, Inc. v. Bakery, Confectionery, Tobacco Workers & Grain Millers, Local 232*, Case. No. C15-00925-SPL, Dkt. No. 1-1 at 54 (D. Ariz. May 21, 2015). The employer challenged the award on the basis that it did not draw its essence from the collective bargaining agreement, and although the Ninth Circuit ultimately disagreed, it held that the employer's arguments were not "frivolous." *Holsum Bakery*, 699 Fed. App'x at 691.

Like the employer in *Holsum Bakery*, UNFI had a right to seek judicial review of the Award here. Although the CBAs state that an arbitration award is "final and binding," they do not state that UNFI waives its rights to seek judicial review of an award or to file an unfair labor practice charge. Because the CBAs do not unequivocally and clearly state that UNFI waived such rights, UNFI was free to file an unfair labor practice charge and seek judicial review of the Award without breaching the CBAs. The Court accordingly denies the Unions' request for summary judgment on their breach of contract claim.

### 5.  Injunctive Relief, Attorney's Fees, and Costs are Premature at this Stage

The Unions seek an injunction to enforce the Award along with attorney's fees and costs. Dkt. No. 70 at 26. However, these requests are premature given the bifurcation of this proceeding. Dkt. No. 37 at 2. In accordance with the Court's prior order, this ruling will be followed by discovery and briefing on appropriate relief, and the Court will consider the Unions' requests for relief at that time. *Id.*

For the foregoing reasons, the Court denies UNFI's motion for summary judgment and grants in part and denies in part the Unions' cross motion for summary judgment.

**D.      Compliance with the Local Rules**

The Court reminds the parties that all filings must comply with this District's Local Rules and with the Court's orders. UNFI has placed extensive portions of its memoranda in single spacing in violation of Local Rule 10(e)(1) and in an obvious attempt to avoid the page limits of Local Rule 7. *See, e.g.*, Dkt. No. 71 at 29–30; Dkt. No. 74 at 16–17; Dkt. No. 76 at 11–13. UNFI also includes extensive arguments in footnotes in another attempt to avoid the page limits and in violation of the Court's standing order. *See, e.g.*, Dkt. No. 71 at 22–31; Dkt. No. 74 at 16, 22; Dkt. No. 76 at 7–16; *see* Dkt. No. 6 at 5 ("Citations should be in Blue Book format and must be included in the body of the briefing – the Court does not allow citations in footnotes or endnotes."). For their part, the Unions also include substantive arguments and citations in footnotes. *See, e.g.,* Dkt. No. 70 at 12, 22–23; Dkt. No. 75 at 3, 5, 7–9. The Court has considered the parties' briefs despite those violations, but it may strike or refuse to consider future noncompliant memoranda.

**III.      CONCLUSION**

For all of the foregoing reasons, the Court DENIES UNFI's motion for summary judgment, Dkt. No. 71, and GRANTS IN PART and DENIES IN PART the Unions' motion for summary judgment, Dkt. No. 70. The parties are directed to submit a joint status report that includes proposed pre-trial deadlines, including a deadline for the parties to complete discovery within 120 days from the date of this order, *see* Dkt. No. 37 at 2, and a proposed briefing schedule regarding the issues of remedies and whether a remand to the arbitrator is warranted to allow the arbitrator to fashion an appropriate remedy. The proposed briefing schedule must include proposed deadlines for only the following briefs: a motion for relief and/or remand by the Unions, a response by UNFI, and a reply by the Unions. No other briefs on those issues will be accepted.

Dated this 2nd day of August, 2022.

Lauren King
United States District Judge